**FAIRFIELD INDUSTRIES, INC. d/b/a FairfieldNodal, Appellant**

v.

**EP ENERGY E&P COMPANY, L.P. f/k/a El Paso E&P Company, L.P., Appellee**

NO. 14-15-00586-CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed July 6, 2017

Rehearing Denied October 5, 2017.

236

W. Ray Whitman, Glen Shu, Joshua Thomas, Houston, TX, Danica Lynn Milios, Kent C. Sullivan, Sean Daniel Jordan, Peter Hansen, Austin, TX, for Appellant.

David M. Gunn, Abigail Noebels, Thomas W. Paterson, Robert Safi, S. Pilar Grantham, Houston, TX, for Appellee.

Panel consists of Chief Justice Frost and Justices Boyce and Christopher.

## OPINION

Kem Thompson Frost, Chief Justice

A licensor of seismic data brought suit against the licensee alleging that the licensee breached the license agreement by (1) failing to pay a fee the agreement required the licensee to pay after a change of control of an entity that controls the licensee, (2) disclosing data in violation of the license agreement, and (3) failing to affix warning labels to the data as required by the license agreement. The trial court granted the licensee's summary-judgment motion and dismissed the licensor's claims. Concluding that the trial court erred in granting summary judgment as to the first claim, we reverse and remand as to that claim and affirm the remainder of the judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant/plaintiff Fairfield Industries, Inc. d/b/a FairfieldNodal collects and processes seismic data and then licenses that data to oil and gas companies. In contracting with a customer-licensee, Fairfield generally enters into a Master License Agreement, which provides the terms and conditions under which Fairfield licenses data to the customer-licensee. The Master License Agreement itself does not obligate customers to purchase data, nor does it obligate Fairfield to provide data. Rather, customers sign "Supplement Agreements" to the Master License Agreement under which the parties specify the data licensed and the license fee to be paid to license the data under the terms of the Master License Agreement. From 1990 through 2010, Fairfield entered into a number of Master License Agreements with appellee/defendant EP Energy E&P Company, L.P. f/k/a/ El Paso E&P Company, L.P. and its predecessors in interest. During this period Fairfield licensed to EP Energy and its predecessors a substantial amount of seismic data through Supplement Agreements to these Master License Agreements.

### The Agreement

Fairfield and EP Energy executed a Master License Agreement as of May 22, 2007 (the "Agreement"). In this contract, the parties agreed that all prior Master License Agreements between Fairfield and

EP Energy's predecessors in interest as of May 22, 2007, were cancelled without prejudice to the rights and obligations accrued thereunder. The parties also agreed that all Supplement Agreements to these prior Master License Agreements became Supplement Agreements to the Agreement and were subject to all of the Agreement's terms as of the date of the Agreement. As of this date, all data Fairfield licensed under the Supplement Agreements was licensed to EP Energy under and subject to the Agreement's terms. After signing the Agreement, Fairfield and EP Energy entered into five additional Supplement Agreements to the Agreement. Fairfield granted EP Energy a non-exclusive right to use the data identified in each Supplement Agreement for a period of twenty-five years from the date of the Supplement Agreement.

### Fee Provision

Under section 5 of the Agreement, Fairfield and EP Energy provided that, in the event of a change in control as to EP Energy or any entity that controls EP Energy, EP Energy "will pay [Fairfield], within thirty (30) days after the effective date of the change in control, for the Data licensed under this Agreement to which the party acquiring control does not already have a license from [Fairfield] for the same type of Data, a fee" determined by a formula in the Agreement (the "Fee").

### Third-Party Disclosure Provision

Under section 3(c) of the Agreement, EP Energy may disclose the geophysical seismic data owned by Fairfield (the "Data") or Data Products [1] to certain third parties for certain purposes only if before viewing any Data or Data product and commencing any work, the third party executes and delivers to EP Energy a written confidentiality agreement under which the third party agrees to certain matters specified in section 3(c) of the Agreement. Under section 3(b) of the Agreement, the parties provided that EP Energy would affix a specified label to certain copies of a Data Product and that each Data Product must contain a specified notice. In section 4 of the Agreement, the parties agreed to a liquidated-damages provision for any breach of section 2 or section 3 of the Agreement.

### Change in Control of EP Energy

A limited liability company affiliated with certain investors purchased EP Energy's parent company on May 24, 2012 (the "Change-in-Control Date") and this purchase constituted a change in control of an entity that directly or indirectly (through one or more other entities) controlled EP Energy.

### EP Energy's Purported Termination of the Agreement

Nine days before the Change-in-Control Date, EP Energy sent a notice to Fairfield purporting to terminate the Agreement immediately. EP Energy stated that it was in the process of preparing to return all physical copies or embodiments of the Data in its possession as well as Data in the possession of any affiliate, consultant, partner, officer, or employee. According to the notice, EP Energy was permanently deleting and causing to be permanently deleted any copies or embodiments from the computers and other systems of EP Energy and all other entities. EP Energy stated that it was not using the Data and

---

1. The Contracting Parties defined "Data Product" to mean "any result or product derived from any processing, interpretation or other use by or for [EP Energy] of any Data or Data Product."

was not using embodiments of the Data. According to a summary-judgment affidavit, on the Change-in-Control Date, EP Energy returned 4,496 data tapes and stored an additional 418 data tapes and Data Products in secure storage inaccessible to EP Energy. The affiant testified that after the Change-in-Control Date, EP Energy found some Fairfield Data and that, in July 2014, EP Energy returned this Data to Fairfield's counsel. According to the affiant, none of Fairfield's Data or Data Products had been used since the Change-in-Control Date.

Fairfield responded that no provision of the Agreement allowed EP Energy to terminate the Agreement unilaterally. Fairfield took the position that the Agreement did not permit EP Energy to relieve itself from its obligations under the Agreement by returning Data and Data Products, ceasing the use of Data and Data Products, or deleting all copies or embodiments of Data and Data Products from EP Energy's computers and other systems. Fairfield later demanded that EP Energy pay the Fee under section 5. EP Energy declined to pay, and Fairfield filed this suit seeking to recover the Fee.

### The Parties' Claims

Fairfield eventually asserted claims for (1) breach of contract based on EP Energy's refusal to pay the Fee, which Fairfield alleges to be in excess of $21 million; (2) breach of the Agreement by disclosing Data in violation of the Agreement; (3) breach of the Agreement by failing to affix warning labels and notices on Data Products to protect their confidentiality; and (4) misappropriating trade secrets. EP Energy asserted various defenses and several counterclaims.

### The Summary-Judgment Motions

EP Energy filed a summary-judgment motion in which it sought dismissal of all Fairfield's claims and judgment as a matter of law on one of EP Energy's counterclaims. Fairfield filed two motions, one seeking dismissal of EP Energy's counterclaims, and the other asserting that EP Energy was liable as a matter of law for the Fee and that EP Energy's defenses failed as a matter of law, without seeking summary judgment as to damages on the Fee claim and without seeking summary judgment as to its other claims.

The trial court granted EP Energy's summary-judgment motion to the extent EP Energy sought dismissal of Fairfield's claims, and denied the remainder of EP Energy's motion. The trial court granted one of Fairfield's motions to the extent Fairfield sought dismissal of EP Energy's counterclaims. The trial court denied the remainder of Fairfield's motions. The trial court ordered that Fairfield take nothing from EP Energy and that EP Energy take nothing from Fairfield.

Fairfield has appealed the trial court's judgment. EP Energy has not appealed.

## II. ANALYSIS

In its first appellate issue, Fairfield asserts that the trial court erred in granting EP Energy's summary-judgment motion as to Fairfield's breach-of-contract claim for the Fee. We review a grant of summary judgment de novo. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). In a traditional summary-judgment motion, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). In our review of the trial court's granting of EP Energy's summary-judg-

ment motion, we consider all the evidence in the light most favorable to Fairfield, crediting evidence favorable to Fairfield if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). In its summary-judgment order, the trial court did not specify the grounds upon which the trial court relied; therefore, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

As to Fairfield's breach-of-contract claim for the Fee, EP Energy asserted the following grounds in its summary-judgment motion:

(1) EP Energy does not owe the Fee because before the change of control, EP Energy waived its right to keep and use the licensed Data, terminated the license under the Agreement, and returned the licensed Data to Fairfield;

(2) EP Energy does not owe the Fee because, under the unambiguous language of the Agreement, EP Energy has to pay the Fee only if EP Energy actually transfers Data to a successor, but EP Energy did not transfer Data to a successor;

(3) The custom and practice of the seismic-data industry confirms that a licensee owes a transfer fee only if the licensee elects to actually transfer licensed Data to a corporate successor;

(4) Fairfield's interpretation of the Agreement would lead to absurd results; and

(5) Even under Fairfield's theory for recovering the Fee, Fairfield seeks to recover based on a liquidated-damages clause in section 5 of the Agreement, and the Fee would be an unenforceable penalty.

**A. Under the Agreement, does EP Energy have to pay the Fee only if EP Energy actually transfers Data to an acquiring successor?**

■ The trial court impliedly granted summary judgment on the ground that EP Energy does not owe the Fee because, under the unambiguous language of the Agreement, EP Energy has to pay the Fee only if EP Energy actually transfers Data to a successor, and EP Energy did not transfer Data to a successor. Fairfield argues that, under the contract's clear text, EP Energy's obligation to pay the Fee after a change in control does not turn on a transfer of Data to a successor or acquiring entity.

*1. Canons of Contract Construction*

■ In construing the Agreement, our primary concern is to ascertain and give effect to the parties' intentions as expressed in the Agreement. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). We examine the entire Agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether the Agreement is ambiguous is a question of law for the court. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* But, when a written contract is worded so that it can be given a certain or

definite legal meaning or interpretation, it is unambiguous, and we construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

 We must enforce an unambiguous contract as written. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). Our role is not to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162; *Helmerich & Payne Intern. Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 646 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We give each term in an agreement its plain, ordinary, and generally accepted meaning unless the agreement itself shows the term to be used in a technical or different sense. *Heritage Res., Inc.*, 939 S.W.2d at 121–22.

### 2. Provisions of the Agreement

In section 2 of the Agreement, Fairfield and EP Energy (collectively the "Contracting Parties") acknowledge that EP Energy gets only the non-exclusive right to use the Data as provided in the Agreement. Under this section of the Agreement, EP Energy may use, disclose, and show the Data and Data Products only as expressly permitted by the Agreement. Except as expressly provided in the Agreement, EP Energy may not "sell, sublicense, transfer, assign, encumber or otherwise dispose of or exploit any of the Data or any Data Product." The Contracting Parties agreed that EP Energy's merging or consolidating with one or more entities would constitute a transfer.

In section 3 of the Agreement, Fairfield grants EP Energy the non-exclusive right to use Data identified in each Supplement Agreement for twenty-five years from the date of the Supplement Agreement and only to use the Data for EP Energy's internal use and benefit. Under section 7 of the Agreement, EP Energy pays Fairfield a fee for Data licensed under the Agreement as specified in the Supplement Agreement pertaining to that Data.

In section 6 of the Agreement, the Contracting Parties mention that Fairfield could terminate the Agreement because of a breach of the Agreement by EP Energy. In section 11 of the Agreement, the Contracting Parties agreed that neither party may waive any of its rights or any obligation of the other party or any provision of the Agreement except by a written instrument signed by that party.

Section 5 of the Agreement governs mergers, consolidations, and changes in control. In striking their bargain, the Contracting Parties considered a number of possibilities on the horizon. Negotiating the terms with advice of counsel, the Contracting Parties agreed on what would happen with each triggering event and spelled out the consequences scenario by scenario in the Agreement.

The second paragraph of section 5 addresses a situation in which EP Energy merges or consolidates with another company and the partners of EP Energy as of May 22, 2007 (the date of the Agreement) own at least fifty percent of the surviving company's equity interest immediately after the merger or consolidation, and these partners control the surviving company. In this type of merger or consolidation, which the Contracting Parties agreed would constitute a transfer, the Data or any Data Product may be transferred to the surviving company, and no party owes a "transfer fee" to Fairfield for the transfer of Data to the surviving company. In this scenario, the surviving company succeeds to all of EP Energy's rights and assumes all EP Energy's obligations under the Agreement.

Section 5's third paragraph addresses a situation in which EP Energy merges or consolidates with another company in a transaction that does not have the characteristics of the merger or consolidation described in the second paragraph. In this type of merger or consolidation, which the Contracting Parties agreed would constitute a transfer, EP Energy (or the surviving company as successor to all EP Energy's rights and obligations) must pay Fairfield, within thirty days after the effective date of the merger or consolidation, "for the Data licensed under this Agreement to which the other party to the merger or consolidation does not already have a license from [Fairfield] for the same type of Data, a fee." Under the formula in section 5's third paragraph, this fee[2] must equal at least half of the cash portion of the license fee.

Section 5's fourth paragraph addresses a situation in which there is a change in control of EP Energy or of any entity which either directly, or indirectly through one or more other entities, controls EP Energy. In this type of change in control, EP Energy must pay Fairfield, within thirty days after the effective date of the change in control, "for the Data licensed under this Agreement to which the party acquiring control does not already have a license from [Fairfield] for the same type of Data," the Fee. Under the formula in section 5's fourth paragraph, the Fee[3] must equal at least half of the cash portion of the license fee. In the fourth paragraph, the parties recite that a change in control may occur by merger, consolidation, acquisition of shares or other interests, or by any other means.[4]

Section 5's sixth paragraph addresses a situation in which a person or entity that engages in the business of exploring for or producing or exploiting hydrocarbons or geophysical data becomes a partner in EP Energy. In this scenario EP Energy must pay Fairfield, within thirty days after that event occurs, "for the Data licensed under this Agreement to which that person or entity does not have a license from [Fairfield] for the same type of Data, a fee." Under the formula in section 5's sixth paragraph, this fee[5] must equal at least half of the cash portion of the license fee.

2. Under section 5's third paragraph, this fee equals "fifty percent (50%) of the sum of (A) the cash, or as the case may be, cash portion of the license fee, plus (B) the total amount of all cash bonuses paid by [EP Energy] or accrued to [Fairfield] as consideration for Data licensed under this Agreement (other than in respect of any overriding royalty interests) prior to the effective date of the merger or consolidation on account of the acquisition of oil, gas or other hydrocarbon or mineral interests or the drilling or the success of any drilling or on account of any other contingency."

3. Under section 5's fourth paragraph, the Fee equals "fifty percent (50%) of the sum of (A) the cash or, as the case may be, cash portion of the license fee, plus (B) the total amount of all cash bonuses paid by [EP Energy] or accrued to [Fairfield] as consideration for Data licensed under this Agreement (other than in respect of any overriding royalty interests)

prior to the effective date of the change in control on account of the acquisition of oil, gas or other hydrocarbon or mineral interests or the drilling or the success of any drilling or on account of any other contingency."

4. If, for example, EP Energy were to merge with a company in a transaction that does not have the characteristics of the merger described in the second paragraph, that transaction very well might fall within the scope of the third paragraph and also constitute a change of control under the fourth paragraph. Therefore, the Contracting Parties agreed that, if a fee were payable under both the third paragraph and the fourth paragraph, Fairfield would be entitled to only a single recovery of the fee.

5. Under section 5's sixth paragraph, this fee equals "fifty percent (50%) of the sum of (A) the cash or, as the case may be, cash portion

### 3. The Plain, Ordinary, and Generally Accepted Meaning of the Term "Transfer"

Though the Contracting Parties agreed that certain mergers or consolidations would constitute a transfer, the parties did not agree that a change in control in which a company purchases EP Energy's parent company would constitute a transfer. The Contracting Parties did not define the term "transfer," and the Agreement does not show that, as to a change in control in which a company purchases EP Energy's parent company, the parties used the term "transfer" in a technical sense or a sense different from the term's plain, ordinary, and generally accepted meaning. *See Heritage Res., Inc.*, 939 S.W.2d at 121–22. The plain, ordinary, and generally accepted meaning of the noun "transfer" in this context is "an act, process, or instance of carrying or taking from one person or place to another." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY·2426–27 (1993) (defining the noun "transfer" as "an act, process, or instance of transferring" and defining the verb "transfer" as "to carry or take from one person or place to another").

When the limited liability company affiliated with certain investors purchased EP Energy's parent company, this purchase constituted a change in control of an entity that either directly or indirectly (through one or more other entities) controlled EP Energy. This purchase did not terminate EP Energy's legal existence, nor did it change EP Energy's non-exclusive right to use Fairfield's Data as permitted by the Agreement. The purchase, in and of itself, did not cause any Data or Data Product to move from EP Energy's possession to another entity's possession. Under the plain, ordinary, and generally accepted meaning of the term "transfer," the purchase of EP Energy's parent company did not effect a transfer of any Data or Data Product. *See id.*

### 4. EP Energy's Arguments Regarding the Alleged Requirement of a Transfer of Data

On appeal, EP Energy argues that the Fee is a "transfer fee"[6] and that, under the unambiguous language of the Agreement, EP Energy must pay the Fee only if EP Energy transferred Fairfield's Data to a new owner as part of a merger or acquisition. EP Energy cites the Contracting Parties' use of the terms "transfer" and "transfer fee" in section 5. Though the parties used these terms in the second and third paragraphs of section 5, they did not use either term in the fourth paragraph addressing changes in control.

EP Energy also contends that because the parties agreed that EP Energy must pay the Fee "for the Data licensed under this Agreement to which the party acquiring control does not already have a license

---

of the license fee, plus (B) the total of all cash bonuses paid by [EP Energy] or accrued to [Fairfield] as consideration for Data licensed under this Agreement (other than in respect of overriding royalty interests) prior to the occurrence of that event on account [of] the acquisition of oil, gas or other hydrocarbon or mineral interests or the drilling or the success of any drilling or on account of any other contingency."

**6.** EP Energy notes that, in Fairfield's live pleading and in various other documents, Fairfield referred to the Fee as a "transfer

fee." In addition, EP Energy cites instances during the deposition of Fairfield's corporate representative when he called the Fee a "transfer fee." These references do not rise to the level of a judicial admission or stipulation that any of EP Energy's arguments as to the interpretation of the Agreement is correct. *See Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996) (holding that statement was not clear, deliberate, and unequivocal so as to constitute a judicial admission).

from [Fairfield] for the same type of Data," EP Energy need not pay the Fee unless EP Energy transferred Fairfield's Data to a new owner as part of a merger or acquisition. The parties agreed that EP Energy would pay the Fee based on "Data licensed under this Agreement to which the party acquiring control does not already have a license from [Fairfield] for the same type of Data." The clear wording of the Agreement reflects that EP Energy need not pay the Fee if the entity acquiring control of EP Energy or an entity that controls EP Energy already has a license from Fairfield for the same type of Data. The Agreement's clear text does not condition EP Energy's obligation to pay the Fee on a transfer of Data by EP Energy to a new owner as part of a merger or acquisition. An entity that does not have a license from Fairfield to use any of the Data licensed under the Agreement can obtain a benefit from this Data by gaining control of EP Energy or an entity that controls EP Energy. The Contracting Parties could have based EP Energy's obligation to pay the Fee on the ability of an entity acquiring control of EP Energy or an entity that controls EP Energy to benefit from the Data licensed by EP Energy rather than on any transfer of the Data to the entity acquiring control or on the acquiring entity's actual use of the Data.

After carefully reviewing the Agreement, we see no language in which the Contracting Parties agree that EP Energy need not pay the Fee unless EP Energy transferred Fairfield's Data to a new owner as part of a merger or acquisition. Though the Contracting Parties could have included language in the Agreement conditioning EP Energy's obligation to pay the Fee after a change in control on a transfer

of Fairfield's Data to an entity acquiring control, the Contracting Parties did not do so.

This court must enforce the unambiguous language of the Agreement as written; we cannot rewrite the Agreement or add to its language under the guise of interpretation. *See American Mfrs. Mut. Ins. Co.,* 124 S.W.3d at 161–62; *Helmerich & Payne Intern. Drilling Co.,* 180 S.W.3d at 642–47. The Agreement's text is unambiguous. As a matter of law, if there is a change in control of EP Energy or of any entity that controls EP Energy, EP Energy must pay the Fee to Fairfield, within thirty days after the effective date of the change in control, for Data licensed under the Agreement to which the party acquiring control does not already have a license from Fairfield for the same type of Data, even if EP Energy does not transfer any of Fairfield's Data to the party acquiring control. *See American Mfrs. Mut. Ins. Co.,* 124 S.W.3d at 158–62; *Helmerich & Payne Intern. Drilling Co.,* 180 S.W.3d at 642–47. Thus, the trial court erred to the extent it granted summary judgment on the ground that EP Energy does not owe the Fee because EP Energy has to pay the Fee only if EP Energy actually transfers Data to a successor or acquiring entity.

**B. Does the custom and usage of the seismic-data industry confirm that a licensee owes a transfer fee only if the licensee elects to actually transfer licensed data to a corporate successor?**

■ EP Energy claims that its summary-judgment evidence established a custom and usage [7] of the seismic-data industry that a licensee owes a transfer fee only if the licensee elects to actually transfer

---

**7.** At various points, EP Energy has used the terms "custom," "usage," and "custom and practice." For ease of reference, we use the

term "custom and usage" in this section of the opinion.

licensed data to a corporate successor. The trial court impliedly granted summary judgment based on this custom and usage. EP Energy submitted evidence concerning (1) statements regarding "transfer fees" contained in a "Statement of Principles" of the International Association of Geophysical Contractors[8] and (2) affidavit testimony by expert witness Gerald Gilbert on the customs and usages of the seismic-data industry.[9] EP Energy also asserts that the behavior of entities other than Fairfield who licensed data to EP Energy is consistent with the evidence from the statement of principles and from Gilbert.

▮ To have proved an industry custom and usage, EP Energy would have to have submitted evidence that the alleged custom and usage is so general and universal that the parties to the Agreement are charged with knowledge of its existence to such an extent to raise a presumption that they dealt with reference to it. See State Nat. Bank of Houston v. Woodfin, 146 S.W.2d 284, 286 (Tex. Civ. App.—Galveston 1940, writ ref'd); XTO Energy, Inc. v. Smith Production, Inc., 282 S.W.3d 672, 682 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd). EP Energy's evidence did not show any general and universal custom in the industry regarding transfer fees or fees payable on a change in control, and this evidence did not purport to prove a custom and usage

that would override the unambiguous language of a contract. Even if we could consider an industry custom and usage in giving effect to the unambiguous Agreement, EP Energy did not prove any such custom and usage. See XTO Energy, Inc., 282 S.W.3d at 682. In addition, even if EP Energy had proved an industry custom and usage regarding transfer fees or fees payable on a change in control, the custom and usage could not be used to contradict the Agreement's unambiguous language. Under this language, if there is a change in control of EP Energy or of any entity that controls EP Energy, EP Energy must pay the Fee to Fairfield, within thirty days after the effective date of the change in control, for Data licensed under the Agreement to which the party acquiring control does not already have a license from Fairfield for the same type of Data, even if EP Energy does not transfer any Data to the party acquiring control. See Dynegy Midstream Servs. v. Apache Corp., 294 S.W.3d 164, 169–70 (Tex. 2009); 4N Intern., Inc. v. Metropolitan Transit Auth., 56 S.W.3d 860, 862–63 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The Contracting Parties were free to agree to a term that contradicts an industry custom and usage. See HighMount Explor. & Prod., LLC v. Harrison Interests, Ltd., 503 S.W.3d 557, 564 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

---

**8.** This Statement of Principles recites that it is "nonbinding" and "offered by IAGC [the International Association of Geophysical Contractors] for discussion and educational purposes only." This Statement of Principles does not purport to articulate any custom and usage that applies to all transfer fees or change-in-control fees in data license agreements, regardless of a particular agreement's language.

**9.** Gilbert testified that it is customary for industry participants interpreting a seismic-data licensing agreement to look first at the language of the agreement. Gilbert also testified

that, if the seismic-data licensing agreement does not address a situation or does not define a term, there are well-established industry customs and usages that sophisticated parties incorporate implicitly into their licensing agreements. The Agreement addresses the change-in-control situation and sets forth the Fee that EP Energy must pay within thirty days after the effective date of the change in control for Data licensed under the Agreement to which the party acquiring control does not already have a license from Fairfield for the same type of Data.

The trial court erred to the extent it granted summary judgment on the ground that the custom and usage of the seismic-data industry confirms that a licensee owes a transfer fee only if the licensee elects to actually transfer licensed data to a corporate successor. *See Dynegy Midstream Servs.*, 294 S.W.3d at 169–70; *HighMount Explor. & Prod., LLC*, 503 S.W.3d at 564; *XTO Energy, Inc.*, 282 S.W.3d at 682.

**C. Does the Agreement allow EP Energy to avoid paying the Fee by waiving its right to keep and use the licensed Data, terminating the license under the Agreement, and returning the licensed Data to Fairfield?**

 In defending against Fairfield's Fee claim, EP Energy pointed to its unilateral actions as a basis for avoiding the Fee. The trial court impliedly granted summary judgment on the ground that EP Energy does not owe the Fee because, before the change of control, EP Energy waived its right to keep and use the licensed Data, terminated the license under the Agreement, and returned the licensed Data to Fairfield. EP Energy has not emphasized this ground on appeal, and Fairfield argues that this ground contradicts the unambiguous language of the Agreement.

Under section 3 of the Agreement, EP Energy's non-exclusive right to use Data identified in each Supplement Agreement expires after a twenty-five-year term. In section 6 of the Agreement, the Contracting Parties say that Fairfield may terminate the Agreement because of a breach by EP Energy. In section 11 of the Agreement, the Contracting Parties agree that neither party may waive any of its rights or any obligation of the other party or any of the Agreement's provisions except by a written instrument signed by that party.

But, allowing EP Energy to sign a written instrument waiving any of its rights or waiving any of Fairfield's obligations or waiving any of the Agreement's provisions does not give EP Energy the right to terminate the Agreement or any Supplement Agreement unilaterally. *See Michels Corp. v. Resitech Indus., LLC*, No. 15-C-0535, 2016 WL 614696, at *6 (E.D. Wis. Feb. 16, 2016) (stating that "a party's agreeing to waive a right under a contract is not the same thing as terminating the entire contract"); *Marvel Entertainment Group v. Elliott*, 169 A.D.2d 473, 564 N.Y.S.2d 720, 721 (1991) (stating that "[t]he waiver of a right under a contract neither terminates the agreement nor operates as a breach").

Under the Agreement's clear text, no provision allows EP Energy to end the Agreement or any Supplement Agreement alone; therefore, EP Energy's attempt to terminate the Agreement or any Supplement Agreement individually had no effect on EP Energy's obligations. EP Energy's scrambling to waive rights and return Data before the change in control did not relieve EP Energy of its obligation to pay the Fee after the change in control. Though the Contracting Parties could have included terms in the Agreement allowing EP Energy to terminate the Agreement or a Supplement Agreement unilaterally, the Contracting Parties did not do so. Nor did the Contracting Parties agree to a calculation of the Fee based on a sliding scale that would take into account a number of factors, including when in the twenty-five-year license period the change in control occurred. We must hold the Contracting Parties to the deal they struck and enforce the unambiguous language of the Agreement as written without creating provisions the parties did not include. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 161–62; *Helmerich & Payne Intern. Drilling Co.*, 180 S.W.3d at 642–47.

Under section 5's fourth paragraph, in the event of a change in control of EP Energy or of any entity that controls EP Energy, EP Energy will pay the Fee to Fairfield, within thirty days after the effective date of the change in control, "for the Data licensed under this Agreement to which the party acquiring control does not already have a license from [Fairfield] for the same type of Data." Though EP Energy paid an up-front license fee to get a non-exclusive right to use the Data identified in each Supplement Agreement for a period of twenty-five years, EP Energy could choose not to use some or all of the Data licensed to it by Fairfield. Or, EP Energy could use the Data for awhile and then choose to stop using the Data even though the license under the Agreement still would be in effect. EP Energy could choose to return all or some of the Data to Fairfield. Nonetheless, as long as Fairfield has not terminated the Agreement based on a breach by EP Energy and as long as the twenty-five-year period has not expired, EP Energy would be free in the future to get the Data back from Fairfield, or to use the Data that it stopped using. EP Energy could choose to waive its right to use the Data and Data Products under the Agreement, return the Data and Data Products, cease the use of the Data and Data Products, and delete all copies or embodiments of Data and Data Products from EP Energy's computers and other systems. But, under the plain wording of the Agreement, any such action would not mean that the Data and Data Products in question are not "licensed under this Agreement" within the meaning of section 5's fourth paragraph.

If the Contracting Parties had wanted to give EP Energy the means to avoid paying the Fee through these unilateral actions, they easily could have accomplished that objective by putting language to that effect in the Agreement. They did not. So, we will not. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 161–62; *Helmerich & Payne Intern. Drilling Co.*, 180 S.W.3d at 642–47. None of the unilateral actions upon which EP Energy relies—waiving its right to keep and use the licensed Data and Data Products, terminating the license under the Agreement, and returning the licensed Data and Data Products to Fairfield—operates to discharge EP Energy of the obligation to pay the Fee after a change in control. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 161–62; *Helmerich & Payne Intern. Drilling Co.*, 180 S.W.3d at 642–47. Thus, the trial court erred to the extent it granted summary judgment on the ground that EP Energy does not owe the Fee because, before the change of control, EP Energy took these unilateral actions.

### D. Would Fairfield's interpretation of the Agreement lead to absurd results?

In the trial court, EP Energy asserted that Fairfield's interpretation of the Agreement would lead to absurd results. On appeal, EP Energy does not brief this argument, but we address it because EP Energy raised it in its summary-judgment motion.

We will not enforce the unambiguous language of a contract if doing so would lead to an absurd result. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 454 (Tex. 2015). But, our jurisprudence reserves the "absurdity safety valve" for truly exceptional cases. *See Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013). Mere oddity does not equal absurdity. *Id.* Likewise, unambiguous contract terms that lead to a quirky or unusual result do not rise to the level of being unthinkable or unfathomable. *See id.* Under this demanding standard, Fair-

field's interpretation of the Agreement would lead to an absurd result only if it were "quite impossible" that a rational person could have intended it. *See id.* at 631.

It is not "quite impossible" that a rational person could have intended that, if there were a change in control of EP Energy or of any entity that controls EP Energy, EP Energy must pay the Fee, equal to at least fifty percent of the original cash licensing fee, within thirty days after the effective date of the change in control, for Data licensed under the Agreement to which the party acquiring control does not already have a license from Fairfield for the same type of Data. *See id.* at 630–31. Nor is it "quite impossible" that a rational person could have intended that EP Energy must pay the Fee under these circumstances, even if EP Energy does not transfer any of Fairfield's Data to the party acquiring control and even if EP Energy has returned the Data and Data Products, stopped using the Data and Data Products, waived its right to use the Data and Data Products, and deleted all copies or embodiments of Data and Data Products from EP Energy's computers and other systems. *See id.* Fairfield's interpretation of the Agreement does not lead to absurd results. *See id.* The trial court erred to the extent it granted summary judgment by relying on the absurdity doctrine.

■ EP Energy also asserts that this court should reject Fairfield's interpretation of the Agreement because it leads to unreasonable, inequitable, and oppressive results. But, in the line of cases EP Energy cites, the courts do not mention unreasonable, inequitable, and oppressive re-

sults; rather, the courts state that they "will avoid when possible and proper" a *construction* that is "unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)) (internal quotations omitted). It is appropriate that the courts in this line of cases do not speak in terms of avoiding unreasonable, inequitable, and oppressive results because of Texas's "paramount public policy" favoring freedom of contract and the narrowness of the absurdity exception to the enforcement of unambiguous instruments. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481, 2017 WL 2023602, at *7 (Tex. May 12, 2017); *Combs*, 401 S.W.3d at 630.

Texas's public policy strongly favors freedom of contract. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d at 481, 2017 WL 2023602, at *7. The Supreme Court of Texas emphasizes that competent parties have the utmost liberty of contract, and that, when entered into freely and voluntarily, contracts shall be held sacred and Texas courts shall enforce them. *Id.* This "paramount public policy" mandates that Texas courts not lightly interfere with freedom of contract. *Id.* Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have entered freely and voluntarily. Parties have the right to contract as they see fit, even agreeing to provisions some might consider extreme, as long as their agreement does not violate the law or public policy.[10] *Id.*; *see, e.g., Pinto Technology Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 442–44, 2017 WL 2200357, at *10–11 (Tex. May 19, 2017) (enforcing contracting par-

---

**10.** EP Energy asserted that under Fairfield's construction of the Agreement, section 5 contains a liquidated-damages provision that is an unenforceable penalty, which is one way of arguing that Fairfield's interpretation of the Agreement violates public policy. Other than

this ground, EP Energy did not assert any summary-judgment ground as to the breach–of-contract claim for the Fee in which EP Energy asserted that the Agreement violates the law or public policy.

ty's agreement in advance to be bound by future nonunanimous amendments to a contract approved by certain contracting parties, even though the party did not agree to the future amendments when they were made and even though the party could not have been aware of the substance of the future amendments when the party agreed in advance to be bound by them).

 Courts are not to avoid enforcing the plain meaning of contractual provisions because the court views the result as unreasonable or imprudent. *See Jaster v. Comet II Const., Inc.,* 438 S.W.3d 556, 570 (Tex. 2014) (plurality op.) (stating a court does not eschew enforcing plain statutory language because the result seems unreasonable to the court); *Combs,* 401 S.W.3d at 630 (stating that an improvident result is not an absurd result). Unless it is "quite impossible" that a rational person could have intended the result that follows from enforcing unambiguous contract language, courts should enforce the language, even if the parties' agreement yields an inequitable or improvident result. *See Combs,* 401 S.W.3d at 630 (stating that even if unambiguous language in a statute yields an inequitable or improvident result, the result is not absurd and the language should be enforced unless the result meets the standard for absurdity because it is "quite impossible" that a rational person could have intended the result). This standard makes it especially difficult to prevail under the absurdity doctrine.

Fairfield's interpretation of the Agreement is not unreasonable, inequitable, or oppressive. In addition, the courts in the line of cases cited by EP Energy say that they will avoid an unreasonable, inequitable, and oppressive construction when possible and proper, and this court has concluded that this line of cases does not override established principles of contract construction under which we give effect to the intent of the contracting parties as

expressed in the unambiguous language of the Agreement. *See Grant Prideco, Inc. v. Empeiria O'Conner, L.L.C.,* 463 S.W.3d 157, 161 n.7 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The trial court erred to the extent the court rejected Fairfield's construction of the Agreement based on a conclusion that this construction would lead to unreasonable, inequitable, and oppressive results or based on a conclusion that this construction is unreasonable, inequitable, or oppressive.

**E. Does Fairfield seek to recover the Fee under a liquidated-damages provision that constitutes an unenforceable penalty?**

 EP Energy moved for summary judgment on the ground that, even under Fairfield's theory for recovering the Fee, Fairfield seeks to recover based on a liquidated-damages clause in section 5 of the Agreement, and the Fee would be an unenforceable penalty. Under binding precedent from this court, the Fee may be an unenforceable penalty only if it constitutes liquidated damages. *See Dresser–Rand Co. v. Bolick,* 2013 WL 3770950, at *5 (Tex. App.—Houston [14th Dist.] Jul. 18, 2013, pet. abated) (concluding that "[b]ecause the obligation was not a liquidated-damages provision, it cannot be an unenforceable penalty"). *Accord Khan v. Meknojiya,* 2013 WL 3336874, at *4 (Tex. App.—Austin June 28, 2013, no pet.) (concluding that "[b]ecause the [provision at issue] is not a liquidated-damages provision, it cannot be an unenforceable penalty, as a matter of law"). In the Fee provision the Contracting Parties did not purport to set in advance a liquidated-damages amount to compensate Fairfield for a breach of the Agreement. Effecting a change in control is not a breach of the Agreement. Under the unambiguous language of the Agreement, section 5 does not contain a liquidated-damages clause, and EP Energy does not

owe the Fee as liquidated damages. *See Dresser–Rand Co.*, 2013 WL 3770950, at *5; *Khan*, 2013 WL 3336874, at *4. The trial court erred to the extent it granted summary judgment on the ground that, under Fairfield's theory for recovering the Fee, Fairfield seeks to recover based on a liquidated-damages clause in section 5 of the Agreement, and the Fee would be an unenforceable penalty.[11] *See Dresser–Rand Co.*, 2013 WL 3770950, at *5; *Khan*, 2013 WL 3336874, at *4.

Because we conclude that the trial court erred in granting summary judgment as to each ground stated in EP Energy's summary-judgment motion, we sustain Fairfield's first issue to the extent Fairfield argues that the trial court erred in granting EP Energy's summary-judgment motion as to Fairfield's breach-of-contract claim for the Fee.

### F. May this court reverse the denial of Fairfield's cross-motion and render judgment?

■ In its first appellate issue, Fairfield also asserts that the trial court erred in denying one of its cross-motions for summary judgment, in which Fairfield sought summary judgment as to liability on its breach-of-contract claim for the Fee, including summary judgment as to nine defenses asserted by EP Energy in its answer but not as a ground for summary judgment in EP Energy's motion. In the cross-motion, Fairfield did not seek summary judgment on the same issue EP Energy addressed in its summary-judgment motion. *See Frontier Logistics, L.P. v. Nat'l Property Holdings, L.P.*, 417 S.W.3d 656, 664 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (noting that courts may review the denial of a cross-motion for summary judgment and render judgment on that motion only in certain circumstances, including when the movant in the cross-motion sought summary judgment on the same issue addressed in the other motion). In the cross-motion Fairfield did not seek a final judgment. *See id.* (noting that courts may review the denial of a cross-motion for summary judgment and render judgment on that motion when the movant in the cross-motion sought a final judgment). In addition, Fairfield did not seek summary judgment as to any declaratory-judgment claim. *See id.* (noting that courts may review the denial of a cross-motion for summary judgment and render judgment on that motion under an exception involving certain claims for declaratory relief). Thus, we may not reverse the trial court's denial of Fairfield's motion and render judgment, and so we overrule the remainder of the first issue. *See Coreslab Structures (Texas), Inc. v. Scottsdale Ins. Co.*, 496 S.W.3d 884, 891 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

### G. Has Fairfield presented argument on appeal challenging each summary-judgment ground asserted against its other breach-of-contract claims?

■ In its second appellate issue, Fairfield asserts that the trial court erred in

11. On appeal, EP Energy asserts that, even if the Fee does not constitute liquidated damages, it still may be an unenforceable penalty. EP Energy effectively argues that Texas law should be expanded so that the scrutiny applied to liquidated-damages provisions also would apply to conditional promises to pay a fee. EP Energy did not expressly present this ground to the trial court in EP Energy's summary-judgment motion; therefore, we may not affirm the trial court's judgment on this ground and we do not consider it. *See Henkel v. Norman*, 441 S.W.3d 249, 251 n.1 (Tex. 2014); *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993). In any event, under this court's binding precedent, the Fee may be an unenforceable penalty only if it constitutes liquidated damages. *See Dresser–Rand Co.*, 2013 WL 3770950, at *5.

granting EP Energy's summary-judgment motion as to Fairfield's claims for (1) breach of contract by disclosing Data in violation of the Agreement; and (2) breach of the Agreement by failure to affix warning labels and notices on Data Products to protect their confidentiality.

As to Fairfield's breach-by-disclosure claims, EP Energy asserted the following grounds in its motion:

(1) EP Energy's disclosure of Data to third parties complied with the Agreement;

(2) EP Energy's disclosure of Data to third parties did not cause Fairfield to suffer any actual damages;

(3) As to all of the blocks as to which EP Energy allegedly disclosed Data, EP Energy complied with the Agreement when EP Energy showed Data and Data Products to potential acquirers of EP Energy or Gulf of Mexico assets and had those parties sign confidentiality agreements before accessing documents;

(4) As to all blocks except High Island A-176, Fairfield has no evidence that the Data Products were derived from Fairfield Data;

(5) As to two of the blocks, EP Energy could not have disclosed Fairfield-derived Data Products because Fairfield did not license any Data to EP Energy for these blocks;

(6) As to the High Island A-176 and Sabine Pass 18 blocks, the Data Products already were in the public domain, and, as a matter of law, there could have been no improper disclosure or harm;

(7) As to the East Cameron 81 block, the Data Products already were in the public domain, and Fairfield has no claim;

(8) As to four other blocks, uncontroverted evidence produced by Fairfield shows that Energy XXI, the purchaser of EP Energy's Gulf of Mexico assets, purchased a license from Fairfield for this Data after Energy XXI acquired these blocks from EP Energy, and thus Fairfield suffered no harm;

(9) The liquidated damages Fairfield seeks under this claim are an unenforceable penalty because the amount of liquidated damages is not a reasonable forecast of just compensation for a breach *ex ante*, when the parties negotiated the Agreement; and

(10) The liquidated damages Fairfield seeks under this claim are an unenforceable penalty because the amount of liquidated damages is not a reasonable forecast of just compensation for a breach, as applied, based on the actual facts in this dispute.

As to Fairfield's claims for breach of the Agreement by failure to affix warning labels and notices on Data Products to protect their confidentiality, EP Energy asserted the following grounds in its motion:

(1) EP Energy maintained the confidentiality of its Data Products, and Fairfield has no actual damages;

(2) Because no provision of the Agreement required EP Energy to retroactively label preexisting Data Products, EP Energy had no duty to label Data Products created before May 18, 1999;

(3) The four-year statute of limitations for breach-of-contract claims bars Fairfield's claims based on Data Products created earlier than March 3, 2010;

(4) The liquidated damages Fairfield seeks under this claim are an unenforceable penalty because the amount of liquidated damages is not a reasonable forecast of just compensation for a breach *ex ante*, when the parties negotiated the Agreement;

(5) The liquidated damages Fairfield seeks under this claim are an unenforceable penalty because the amount of liq-

uidated damages is not a reasonable forecast of just compensation for a breach as applied, based on the actual facts in this dispute; and

(6) Fairfield has no evidence that it suffered any actual harm caused by the lack of warning labels.

██ When, as in this case, the trial court does not specify the grounds upon which the trial court relied, we must affirm the trial court's ruling if any of the independent grounds is meritorious. *See FM Props. Operating Co.*, 22 S.W.3d at 872. In this circumstance, the appealing party must challenge all possible grounds on which the motion could have been granted, properly or improperly. *See FinServ Cas. Corp. v. Transamerica Life Ins. Co.*, No. 14-14-0838-CV, 523 S.W.3d 129, 139–40, 2016 WL 6134442, at *6 (Tex. App.—Houston [14th Dist.] Oct. 20, 2016, no pet. h.). Failure to do so can be fatal to the appellate challenge. Today's case presents both a voluminous record and multi-faceted legal challenges. The parties have raised and briefed many complicated issues. Though Fairfield presented a lengthy and detailed opening brief on appeal, Fairfield did not present argument challenging the second or ninth ground listed above as to the disclosure claims, nor did Fairfield present argument challenging the fourth or sixth grounds as to the labeling claims. Even construing Fairfield's appellate brief liberally, we cannot conclude that Fairfield has briefed arguments challenging each of the independent grounds on which the trial court granted summary judgment as to Fairfield's disclosure claims and labeling claims. *See Navarro v. Grant Thornton, LLP*, 316 S.W.3d 715, 719–20 (Tex. App.—Houston [14th Dist.] 2010, no pet.). We

thus overrule Fairfield's second issue.[12] *See id.*

## III. CONCLUSION

Under the Agreement's unambiguous language, if there is a change in control of EP Energy or of any entity that controls EP Energy, EP Energy must pay the Fee, equal to at least fifty percent of the original cash licensing fee, to Fairfield, within thirty days after the effective date of the change in control, for Data licensed under the Agreement to which the party acquiring control does not already have a license from Fairfield for the same type of Data. EP Energy must pay the Fee under these circumstances, even if EP Energy does not transfer any of Fairfield's Data and Data Products to the party acquiring control and even if EP Energy has returned the Data and Data Products, stopped using the Data and Data Products, waived its right to use the Data and Data Products, and deleted all copies or embodiments of Data and Data Products from EP Energy's computers. Fairfield's interpretation of the Agreement is not unreasonable, inequitable, or oppressive, nor does this interpretation lead to absurd results.

Section 5 of the Agreement does not contain a liquidated-damages clause, and EP Energy does not owe the Fee as liquidated damages. Thus, the trial court erred to the extent it granted summary judgment on the ground that, under Fairfield's theory for recovering the Fee, Fairfield seeks to recover based on a liquidated-damages clause in section 5 of the Agreement, and the Fee would be an unenforceable penalty.

Under a textual analysis of the Agreement, no provision allows EP Energy to terminate the Agreement by unilateral ac-

---

**12.** Even if Fairfield had briefed arguments challenging each of the independent grounds, we still would conclude that the trial court did not err in granting summary judgment as to Fairfield's disclosure claims and labeling claims.

tion, and EP Energy's attempt to do so was ineffective and did not relieve EP Energy of its contractual obligation to pay the Fee after a change in control.

We thus reverse the trial court's judgment as to Fairfield's breach-of-contract claim to recover the Fee and remand for further proceedings. We affirm the remainder of the trial court's judgment.[13]

13. On appeal, Fairfield has not challenged the trial court's summary judgment as to Fairfield's misappropriation-of-trade-secrets claim.