**Reversed and Rendered and Opinion filed October 6, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00414-CV

---

## SAN JACINTO RIVER AUTHORITY, Appellant

## V.

## EDGAR GONZALEZ, ET AL., Appellees

---

**On Appeal from the County Civil Court at Law No. 2**
**Harris County, Texas**
**Trial Court Cause No. 1137397**

---

## O P I N I O N

This case involves takings claims by 85 plaintiffs under the Texas Constitution against a river authority based on the authority's release of water from Lake Conroe into the San Jacinto River during Hurricane Harvey that allegedly caused flooding that allegedly damaged the plaintiffs' homes. The authority challenges the trial court's denial of its plea to the jurisdiction as to the takings claims and asserts that the plaintiffs have not shown a waiver of the authority's governmental immunity as to the plaintiffs' other claims. We reverse and render.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Hurricane Harvey and the resulting flooding in southeast Texas has resulted in multiple lawsuits and appellate decisions. In this case, we deal with claims involving the release of water from Lake Conroe.

Appellees/plaintiffs Edgar Gonzalez and 84 other individuals[1] (collectively the "Gonzalez Parties") filed this suit against appellant/defendant San Jacinto River Authority (the "Authority"). The Gonzalez Parties allege that they live in homes on a total of 61 different properties. They assert that the Authority is a governmental entity that maintains Lake Conroe and the Lake Conroe Dam. In late August 2017, Hurricane Harvey made landfall along Texas's Gulf Coast and produced high rainfall amounts in Texas, including in Harris and Montgomery counties. The Gonzalez Parties allege that by about 12:30 a.m. on August 27, 2017, Hurricane Harvey had dumped so much water into Lake Conroe that the Authority decided to open the Lake Conroe Dam to release water from the lake. According to the Gonzalez Parties, over the next three days, the release rate of water from Lake Conroe through the dam set and broke new records, eventually culminating in a

---

[1] The names of all of the Gonzalez Parties are as follows: Edgar Gonzalez, Monica Gonzalez, Lisa Agnew, Darolyn Butler, Bertha E. Stewart, Jose O. Erazo, Carmen Rodriguez de Erazo, Jose Marroquin, Rebecca Hernandez, Eli Ortiz, Emily Ortiz, Orlando Locayo, Matilde Locayo, Ronnie Moors, Ingrid Plevka, Priscilla Zamora, Lawrence Culton, Shanikka Culton, Jordan Morales, Donna Brown, John Clancy, John Kish, Peggy Jones, Andre Hatter, Mary Hatter, Harold Cormier, Wanda Cormier, Manuel Jackson, Joseph Joe, Tawania Joe, Dectrick Edwards, Samantha Edwards, Preston Davis, Chiquita Davis, Kenny Coston, Golden Coston, Danesa Samuels, Tamara Curl, Alma Lagunas, Charles McFarland, Dionne McFarland, Walter Johnson, Jacquiline Johnson, Shonda Espinoza, Lawrence Duhe, Natasha Atkins, Israel Cervantes, Amanda Cervantes, Staci McFarland, Warner Chandler, Amber Chandler, Eileen Shim-Agimudie, Sam Al Hawamdeh, Husam Al Hawamdeh, Rene Tario, Juan Suarez, Regina Freberg, Billy West, Ramon Mosqueda, Maria Mosqueda, Mark Melchor, Gloria Melchor, Tana Lynne Gilliard, Robert Henrickson, Carl Williams, Louise Williams, Kishawna Wright, James Bullock, Hugo Santos, Katherine Sells, Cilica Edwards, Natasha Gates, John Giovanelli, Anthony Limon, Claudia Ledezma, Marely Ledezma, Viliami Feletoa, Rosemarie Parrino, Alicia Lewis, Sunday Eluyemi, Armida Carballo, Charles Rogers, Josie Rogers, Maria Rauda, and Shamir Westbrooks.

release rate of 79,100 cubic feet of water per second ("cfs"), surpassing the record set in 1994. The Gonzalez Parties contend that as a result of these record-breaking releases from Lake Conroe, water from Lake Conroe caused the Gonzalez Parties' homes to flood, resulting in severe property damage.

The Gonzalez Parties have asserted the following claims against the Authority: (1) an inverse-condemnation or takings claim under article I, section 17 of the Texas Constitution, (2) a nuisance claim, and (3) a purported claim for grossly negligent maintenance and operation of the Lake Conroe Dam. The Gonzalez Parties claim that their homes would not have flooded but for the water released by the Authority from Lake Conroe.

The Gonzalez Parties allege that the Authority was aware that water releases from Lake Conroe in 1994, 1998, 2001, 2002, 2015, and 2016 caused downstream flooding in parts of Kingwood, Humble, and other places downstream of the Lake Conroe Dam. The Gonzalez Parties allege that the Authority took their homes intentionally.

The Gonzalez Parties acknowledge in their live petition that the Authority is a governmental entity generally entitled to governmental immunity from suit; however, the Gonzalez Parties assert the takings provision of the Texas Constitution as a waiver of governmental immunity that allows them to receive just compensation for the takings alleged in their petition. The Gonzalez Parties also assert in their petition that governmental immunity does not shield the Authority from liability for "intentional, non-negligent nuisance and gross negligence relating to the improper maintenance of [the Authority's] property."

The Authority filed a plea to the jurisdiction asserting that its governmental

3

immunity barred all of the Gonzalez Parties' claims ("Jurisdictional Plea").[2] The Authority argued that the evidence before the trial court conclusively demonstrated that the Gonzalez Parties cannot prove that the Authority caused a taking of any property owned by one of the Gonzalez Parties. The Authority asserted that even if no water had been released from the Lake Conroe Dam, each of the Gonzalez Parties' properties would have flooded during the Harvey storm event. The Authority contended that the evidence negates the requisite intent element of the Gonzalez Parties' takings claims. According to the Authority, the undisputed evidence shows that the Gonzalez Parties cannot demonstrate the Authority knew or could have known that any release of water from the Lake Conroe Dam would or was substantially certain to cause flooding on the specific, individual property of any of the Gonzalez Parties, which the Authority contends is required to successfully demonstrate a takings claim.

The Authority also challenged the Gonzalez Parties' other two claims, asserting that (1) absent a statutory waiver of immunity, a governmental entity is immune from suit for a nuisance claim unless the claim rises to the level of a constitutional taking under Article I, Section 17 of the Texas Constitution; (2) governmental immunity bars any taking-by-nuisance claim for the same reasons asserted by the Authority against the takings claim; (3) the Texas Tort Claims Act does not waive the Authority's governmental immunity; and (4) the only waiver of governmental immunity relied on by the Gonzalez Parties is the takings provision of the Texas Constitution.

The Authority attached to the Jurisdictional Plea (1) a declaration by Charles

---

[2] Though a party may file a no-evidence motion for summary judgment challenging the trial court's subject-matter jurisdiction, the Authority did not do so in today's case. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551–52 (Tex. 2019). Instead, the Authority challenged the trial court's subject-matter jurisdiction by a plea to the jurisdiction.

Gilman, Jr., the Authority's Director of Water Resources and Flood Management, (2) a declaration by Mark E. Forest, a hydrology expert retained by the Authority, and (3) a declaration by Hector Olmos, a Vice President of Freese and Nichols, Inc., a company that has provided consulting services to the Authority.

The Gonzalez Parties responded in opposition and submitted some evidence, but they did not submit any expert testimony. The Gonzalez Parties asserted various objections to the form of the Authority's evidence, as well as objections that Exhibits C-5 and C-7 attached to Forest's declaration are conclusory. The trial court signed an order in which it denied the Jurisdictional Plea only as to the takings claim. The trial court did not rule on the Jurisdictional Plea as to the other two claims, and the trial court did not rule on any of the Gonzalez Parties' objections. The next day, the Authority filed a notice of appeal, perfecting this interlocutory appeal under section 51.014(a)(8) of the Civil Practice and Remedies Code and triggering the stay under section 51.014(b). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(8),(b) (West, Westlaw through 2021 C.S.). Two days later the Gonzalez Parties filed a written request asking the trial court to rule on their objections to the Authority's evidence and objecting to the trial court's alleged refusal to rule on the objections. On the same day as the written request, the Authority moved to strike the Gonzalez Parties' filing based on the stay of all proceedings triggered by the Authority's appeal. Our record does not contain a ruling from the trial court on the Gonzalez Parties' objections to the Authority's evidence, on the request for such a ruling, or on the Authority's motion to strike.

## II. ISSUES AND ANALYSIS

The Authority is a conservation and reclamation district created in 1937 as a political subdivision of the State of Texas. *See* Act of May 12, 1937, 45th Leg., R.S., ch. 426, § 1, 1937 Tex. Gen. Laws 861, 861 (creating the Authority and

5

naming it the "San Jacinto River Conservation and Reclamation District"); Act of May 14, 1951, 52nd Leg., R.S., ch. 366, § 1, 1951 Tex. Gen. Laws 617, 617 (renaming the Authority the "San Jacinto River Authority"); *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 621 (Tex. 2021). In 1973, the Authority completed the construction of an earthen dam across the West Fork of the San Jacinto River (the "Lake Conroe Dam") to create Lake Conroe. *See Medina*, 627 S.W.3d at 621. The Authority has operated and maintained Lake Conroe and the Lake Conroe Dam since that time. *See id.*

The Authority is a political subdivision of the State of Texas that generally is entitled to governmental immunity. *See Medina*, 627 S.W.3d at 622. Governmental immunity from suit defeats a trial court's subject matter jurisdiction and thus properly is asserted in a plea to the jurisdiction. *See Olivares v. Brown & Gay Engineering, Inc.*, 401 S.W.3d 363, 369 (Tex. App.—Houston [14th Dist.] 2013, *aff'd*, 461 S.W.3d 117, 119 (Tex. 2015). We review de novo the trial court's ruling on a plea to the jurisdiction. *Id.*

**A. Did the trial court err in denying the Jurisdictional Plea as to the Gonzalez Parties' takings claims because the evidence proves as a matter of law that the Gonzalez Parties cannot prove causation?**

The Texas Constitution waives governmental immunity for a viable inverse-condemnation or takings claim under article I, section 17 of the Texas Constitution. *See* Tex. Const. art. I, § 17(a); *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980). If a plaintiff cannot establish a viable takings claim against a governmental entity, then there is no waiver of governmental immunity under article I, section 17 of the Texas Constitution, and the trial court lacks jurisdiction. *See* Tex. Const. art. I, § 17(a); *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013). Proximate cause is an essential

element of a takings claim. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483 (Tex. 2012). For a governmental entity to be liable for a takings claim, the governmental entity's intentional action must have been a proximate cause of the taking or damaging of the claimant's property. *See State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941). The determination of whether a taking has occurred is not formulaic given the legal and factual complexities sometimes presented, and this determination may turn on the confluence of particular circumstances. *See Harris County Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 806–07 (Tex. 2016).

In a plea to the jurisdiction, a party may challenge the pleadings or the existence of jurisdictional facts. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). The Authority does not assert that the Gonzalez Parties failed to properly plead a viable takings claim. Instead, as to the arguments under the Authority's first, second, and third issues, the Authority's Jurisdictional Plea challenged the existence of jurisdictional facts. The jurisdictional challenges the Authority raises under these issues implicate the merits of the Gonzalez Parties' takings claims and the Jurisdictional Plea involves evidence. Therefore, we review the evidence relevant to the jurisdictional challenge to determine if a fact issue exists. *Miranda*, 133 S.W.3d at 227; *In re K.D.H.*, 426 S.W.3d 879, 887 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. If the relevant evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact finder will resolve the fact issue. *Miranda*, 133 S.W.3d at 227–28; *In re K.D.H.*, 426 S.W.3d at 887. However, if the evidence relevant to the jurisdictional issue is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228; *In re K.D.H.*, 426

S.W.3d at 887.

In its first issue, the Authority asks, "Did [the Gonzalez Parties] meet their burden to raise a fact issue that the [Authority's] release of water from Lake Conroe Dam was a proximate cause of flooding of their homes, when (i) they do not live downstream from the Dam, and (ii) offered no proof that their properties flooded because of water from Lake Conroe?" The first issue refers to the jurisdictional challenge in which the Authority argues that the Gonzalez Parties cannot prove that the Authority's release of water from Lake Conroe was a proximate cause of any taking or damaging of the Gonzalez Parties' property. Thus, we review the evidence relevant to this jurisdictional issue to determine whether it is undisputed or fails to raise a fact question. *See Miranda*, 133 S.W.3d at 228; *In re K.D.H.*, 426 S.W.3d at 887.

1.    *Various Arguments by the Authority*

(a)    **Did water from Lake Conroe reach the Gonzalez Parties' homes?**

Under its first issue, the Authority asserts that it is physically impossible that any of the molecules of water released from Lake Conroe during Harvey would have reached any of the Gonzalez Parties' homes because: (1) the Gonzalez Parties live several miles up two different streams—Cypress Creek and Spring Creek; and (2) to reach the Gonzalez Parties' homes, water from Lake Conroe would have had to flow 41 miles south to its juncture with these creeks, and then several miles upstream against massive flooding coming the other way. In making these assertions, the Authority seeks to negate the Gonzalez Parties' allegation in their live pleading that "[a]s a result of these record-breaking releases in the middle of a major hurricane, water from Lake Conroe eventually reached the [the Gonzalez Parties'] homes and caused severe property damage to them." The Gonzalez Parties presented no evidence that any of the water molecules from Lake Conroe

8

reached their homes. We presume for the sake of argument that the evidence proves as a matter of law that none of the water that the Authority released from Lake Conroe reached any of the Gonzalez Parties' homes. The Authority, however, concedes that is not the end of the inquiry. The Authority acknowledges that even though Lake Conroe water did not reach the Gonzalez Parties' homes, the release could nevertheless still be a "taking" if the release of Lake Conroe water caused other tributaries to back up and flood the Gonzalez Parties' homes.

### (b) Did water released from Lake Conroe cause the Gonzalez Parties' homes to flood?

The Authority argues that its release of water from Lake Conroe did not cause the Gonzalez Parties' homes to flood. The Authority bases this argument on several facts.

First, the Authority points out that the area around the Gonzalez Parties' homes received far more rainfall that the Lake Conroe watershed. The Lake Conroe watershed received approximately 20 inches of rain whereas the area along the Spring and Cypress creeks received 30+ inches of rain. Lake Conroe discharges into the West Fork of the San Jacinto River and eventually flows about 50 miles into Lake Houston. As stated previously, forty-one miles south of the Lake Conroe dam the Spring and Cypress creeks join with the West Fork. The Authority points out that water released from Lake Conroe accounted for 12% of the inflow in Lake Houston, whereas water from Spring Creek and Cypress Creek accounted for 24% of inflow into Lake Houston. The Gonzalez Parties did not contest this data.

Second, the Authority argues that timing does not support the Gonzalez Parties' argument that the Lake Conroe discharge caused flooding of their homes. The Authority did not begin releasing water from Lake Conroe until early on August 27, 2017. The Authority's experts state that it would take 30 hours for water from Lake Conroe to travel the 41 miles to the confluence with Spring and

9

Cypress creeks. By that time, the West Fork of the San Jacinto was already at flood stage.  Again, the Gonzalez Parties did not contest this data.

The Authority thus argues that the Gonzalez Parties' homes would have flooded during Harvey even in the hypothetical scenario in which no water was released from Lake Conroe during Harvey (the "No Release Scenario"). The Authority supported this argument with the declaration of Mark Forest, a hydrology expert. The Authority contends that Forest's modeling shows that even in the No Release Scenario, the Gonzalez Parties' homes would have flooded anyway. Therefore, the Authority argues that the Gonzalez Parties cannot prove that the Authority's release of water from Lake Conroe was a proximate cause of any alleged taking or damaging of the Gonzalez Parties' property. The Authority asserts that the trial court erred in denying the Jurisdictional Plea as to the Gonzalez Parties' takings claims based on Forest's undisputed testimony. Forest testified in his declaration as follows:

- With others working under Forest's supervision, Forest evaluated rainfall data from the National Weather Service and multiple other sources, streamflow data from the United States Geological Survey, the Harris County Flood Control District, and topographic data and bathymetric data from multiple sources, to assess and model the riverine flood—the flood from water that flowed in through rivers and other surface waterways—that occurred during the Hurricane Harvey event from August 26 to August 30, 2017.

- Forest and others working under his supervision constructed models of the 2017 flooding event using the U.S. Army Corps of Engineers software to simulate the flow behaviors associated with the West Fork San Jacinto and other tributaries as they combine within Lake Houston and discharge from Lake Houston into the San Jacinto River downstream of Lake Houston.

- The Corps of Engineers software they used is considered industry standard for this type of analysis and are software packages that have been rigorously tested and well documented. This software is

also the most commonly used software in the development of Federal Emergency Management Agency ("FEMA") flood studies, and the software provide the basis for most of the FEMA Flood Insurance Rate Maps.

- Forest and others working under his supervision constructed a model of the flood as it would have occurred had no floodwater flowed downstream from Lake Conroe, that is, in the hypothetical and impossible scenario in which the Lake Conroe Dam did not release any floodwater and instead retained all inflow into Lake Conroe behind the Dam until some point after the end of the Harvey event. This simulation is not realistic because this scenario presumes an imaginary and infinitely high Lake Conroe Dam.

- The technical memoranda attached to Forest's declaration as Exhibits 2, 3, 4, and 5 were prepared under Forest's direction, oversight, and supervision. Forest reviewed each of these memoranda, and he agrees with and adopts all analyses and conclusions therein as if they were fully stated in Forest's declaration.

- The results presented in Exhibit 5 to Forest's declaration are shown to match very well to a range of observations that include United States Geological Survey ("USGS") gages, USGS high water marks, and photographic evidence available in the public domain with regard to flooding extents, water surface elevations, and timing associated with maximum water levels and water levels at other times during the event.

- The hydrologic and hydraulic model of the flood that would have occurred had no floodwater been released from Lake Conroe is a purely hypothetical exercise because it would not have been physically possible for the Lake Conroe Dam not to release water as it is currently constructed. The level of Lake Conroe would have reached 213.6 feet above mean sea level, exceeding the top of the dam by about three feet. Such overtopping of Lake Conroe Dam would have compromised the integrity of the dam embankment and created the potential risk of dam failure due to overtopping. A dam failure would have been "far more consequential to the downstream reach compared to the observed event."

Based on the Forest declaration, the Authority argues that release from Lake

Conroe could not have caused the Gonzalez Parties' home to flood. Specifically, the Authority argued:

- 53 homes (77 Plaintiffs) were flooded by Cypress Creek or Spring Creek alone, beyond the limits of any potential influence by water from Lake Conroe;

- 3 homes (3 Plaintiffs) were within the limits of potential influence from Lake Conroe, but their residences were so low they would have flooded from Cypress Creek no matter what happened at Lake Conroe; and

- 5 homes (5 Plaintiffs) were flooded entirely by local runoff that overwhelmed the storm drains in their own neighborhoods.

Finally, the Authority points out that the peak rate of discharge of water from the Lake Conroe Dam in connection with Hurricane Harvey did not exceed the peak inflow into Lake Conroe in connection with Hurricane Harvey. The Authority submitted evidence that it retained an outside consultant to create a Gate Operations Policy that was programmed so that the peak outflow from Lake Conroe never exceeded 80% of the peak inflow. Thus, that the peak inflow into Lake Conroe during Harvey was 129,065 cubic feet per second whereas peak outflow was 79,141 cubic feet per second.

2.     *Response by the Gonzalez Parties.*

The Gonzalez Parties responded in opposition to the Jurisdictional Plea and submitted the following evidence: (1) an unsworn declaration in which the declarant authenticates six exhibits submitted by the Gonzalez Parties; (2) four press releases issued by the Authority during Harvey; (3) "Guidelines for Operation and Maintenance of Dams in Texas," issued by the Texas Commission on Environmental Quality; and (4) a printout from the Authority's website entitled "Lake Conroe: A Water Supply Reservoir." The Gonzalez Parties did not submit any of the following: (1) any testimony by an expert witness; (2) any testimony by

12

any of the Gonzalez Parties; (3) any evidence as to the extent to which any of the properties in question flooded during Harvey; (4) any evidence as to how much any of the properties in question would have flooded had no water been released from Lake Conroe during Harvey; or (5) any evidence disputing Forest's statement of the elevation of each property or the data generated by Forest's modeling regarding the properties in question.

Rather than submit expert testimony, the Gonzalez parties have done two things. First, they argue that the Authority made judicial admissions in its brief. Second, they rely on objections they asserted in the trial court to the Forest declaration and exhibits on a variety of grounds.

### (a) Is Exhibit 5 conclusory?

The Gonzalez Parties argue that Exhibit 5 to Forest's declaration is conclusory because Forest does not explain in Exhibit 5 how he arrived at his conclusions in this case. An expert's statement or opinion is conclusory when: (1) the expert asks the jury to take the expert's word that the expert's opinion is correct but offers no factual basis for the opinion or the factual bases offered do not support the opinion; or (2) the expert offers only the expert's word that the factual bases offered to support the opinion actually exist or support the opinion. *See Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019). Conclusory testimony cannot support a judgment even if no objection to the testimony was made in the trial court. *See id*. at 770.

Forest adopted all analyses and conclusions in the 71-page Exhibit 5 and incorporated them into his declaration. Nonetheless, Forest's declaration contained 36 paragraphs, encompassing 18 pages, and the Gonzalez Parties do not assert that any of the statements in these paragraphs are conclusory. The statements in paragraphs 16 through 33 of the declaration are not conclusory and explain how

Forest reached his conclusions in this case.

In Exhibit 5, Forest describes his methodology, the sources of the data he used to validate his modeling, and the ways in which he validated his modeling. Forest also provides (1) 62 figures, including figures depicting the locations of the Gonzalez Parties' homes; and (2) a table showing the elevation of each of the Gonzales Parties' properties, the maximum water surface elevation on each property shown by Forest's modeling for the actual Harvey event, and the maximum water surface elevation on each property shown by Forest's modeling in the No Release Scenario. The Gonzalez Parties complain that Forest "only gives the reader mostly incomprehensible maps with no apparent relationship to the [Gonzalez Parties'] homes, incomprehensible graphics, insufficient explanations of methodology, no explanation of [how] the modeling software works, and explanations of how [Forest] reached his conclusions in a completely different case." We do not agree that Forest's maps are "mostly incomprehensible" with no apparent relationship to the Gonzalez Parties' homes, nor do we believe that Forest's graphics are incomprehensible. Forest's failure to provide a detailed explanation of how the modeling software works does not make Exhibit 5 conclusory. Forest did use data regarding the flooding of a property involved in another lawsuit to validate his modeling. Nonetheless, Forest explained in Exhibit 5 how he reached his conclusions in this case, not his conclusions in the other lawsuit.

In Exhibit 5 Forest offers a factual basis for the opinions and conclusions stated in the exhibit, and these factual bases support Forest's opinions and conclusions. Thus, the Gonzalez Parties' argument that Exhibit 5 is conclusory lacks merit.[3] *See Windrum*, 581 S.W.3d at 769; *Phillips Development & Realty,*

---

[3] In Exhibit 7 to Forest's declaration, Forest provides three figures that purport to depict the

*LLC v. LJA Engineering, Inc.*, 499 S.W.3d 78, 89–90 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

In its opening brief, the Authority states that Forest's report "does not try to explain to a layperson how hydrology or the Army Corps' software works." The Gonzalez Parties assert that this statement constitutes a judicial admission that Exhibit 5 is conclusory. In this statement, the Authority does not address whether Forest offered a factual basis for the opinions or conclusions stated in Exhibit 5, or whether any such factual bases support Forest's opinions or conclusions. This statement from the Authority's opening brief does not rise to the level of a clear, deliberate, and unequivocal statement that Exhibit 5 is conclusory, as is required for a judicial admission. *See Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, 531 S.W.3d 234, 244 n.6 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (holding that statements in live pleading and other documents did not rise to the level of a judicial admission as to the correctness of any of the opposing party's arguments). Exhibit 5 is not conclusory, and the Authority has not judicially admitted that Exhibit 5 is conclusory.

### *(b)*     *The Gonzalez Parties' Objections to Form*

In the trial court, the Gonzalez Parties asserted the following objections to the form of some of the evidence submitted by the Authority: (1) the exhibits attached to the Olmos declaration and the exhibits attached to the Forest declaration (collectively, the "Exhibits") are hearsay; (2) Paragraphs 14 and 19 from the Olmos declaration and Paragraphs 16 and 17 from the Gilman declaration violate the best-evidence rule; and (3) the Authority did not properly authenticate

---

maximum inundation limits in three scenarios. The Gonzalez Parties assert that Exhibit 7 is conclusory. We presume, without deciding, that Exhibit 7 is conclusory and that it is incompetent to prove any issue as to the Jurisdictional Plea.

the Exhibits. On appeal, the Gonzalez Parties assert that the trial court overruled theses objections or, in the alternative, refused to rule on them. Though the Gonzalez Parties do not assert that the trial court erred in overruling or refusing to rule on these objections, the Gonzalez Parties assert that this court should not consider the evidence to which they have objected in determining whether the trial court erred in denying the Jurisdictional Plea as to their takings claims. We presume for the sake of argument that, under a liberal construction of the Gonzalez Parties' briefing, they argue as an alternative basis for affirming the trial court's order, that the trial court abused its discretion in overruling or refusing to rule on these objections, and that if the trial court had sustained these objections, the remaining evidence would be insufficient to support a judgment affirming the trial court's order. *See Berry v. Covarrubias*, No. 14-03-01137-CV, 2004 WL 1631117, at *7, n.13 (Tex. App.—Houston [14th Dist.] Jul. 22, 2004, no pet.) (mem. op.).

All of these objections are objections to form, as to which the Gonzalez Parties had to preserve error in the trial court. *See In re Longoria*, 470 S.W.3d 616, 630 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding); *Cantu v. Frye & Assocs., PLLC*, No. 01-12-00868-CV, 2014 WL 2626439, at *7, *10 n.3 (Tex. App.—Houston [1st Dist.] June 12, 2014, no pet.); *Pico v. Capriccio Italian Restaurant, Inc.*, 209 S.W.3d 902, 909 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The record reflects that the trial court did not rule on any of the Gonzalez Parties' objections to the Authority's evidence.

The trial court signed an order in which it denied the Jurisdictional Plea only as to the takings claim. In this order, the trial court did not rule on any of the Gonzalez Parties' objections. The next day, the Authority filed a notice of appeal, perfecting this interlocutory appeal under Civil Practice and Remedies Code section 51,014(a)(8), thus triggering the stay under section 51.014(b) of "the

commencement of a trial in the trial court [and] all other proceedings in the trial court pending resolution of [the] appeal." Tex. Civ. Prac. & Rem. Code Ann. § 51.014(b) (West, Westlaw through 2021 C.S.); *see id*. § 51.014(a)(8) (allowing an appeal from an interlocutory order by a county court at law that grants or denies a plea to the jurisdiction filed by a governmental unit). Two days later the Gonzalez Parties filed a written request asking the trial court to rule on their objections to the Authority's evidence and objecting to the trial court's alleged refusal to rule on the objections. On the same day as the written request, the Authority moved to strike this motion based on the stay of all proceedings triggered by the Authority's appeal. Under the plain text of section 51.014(b) and Supreme Court of Texas precedent interpreting it, the filing of the Authority's notice of appeal triggered a statutory stay of all proceedings in the trial court pending resolution of the appeal, and there are no exceptions to this stay. *See In re Geomet Recycling, L.L.C.*, 578 S.W.3d 82, 86–87 (Tex. 2019). A filing by a party in the trial court is a proceeding barred by this stay. *See City of Houston v. Swinerton Builders, Inc*., 233 S.W.3d 4, 8–9 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The Authority timely objected to the Gonzalez Parties' violation of the stay by filing the document containing their objection to the trial court's alleged refusal to rule on their evidentiary objections. *See Roccaforte v. Jefferson Cty.*, 341 S.W.3d 919, 923 (Tex. 2011). Therefore, this document is without force and is ineffective to preserve error on the Gonzalez Parties' objections to form. *See In re Geomet Recycling, L.L.C.*, 578 S.W.3d at 86–87; *Roccaforte*, 341 S.W.3d at 923; *Swinerton Builders, Inc*., 233 S.W.3d at 8–9. The Gonzalez Parties did not obtain an adverse ruling on their objections to form, and they did not lodge an effective objection to any alleged refusal by the trial court to rule on the objections to form. Therefore, the Gonzalez Parties failed to preserve error in the trial court as to their objections to form. *See* Tex. R. App. P. 33.1(a)(2); *Grace Interest, LLC v. Wallis State Bank*, 431 S.W.3d

17

110, 122 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). In any event, the trial court would not have abused its discretion if it had overruled the Gonzalez Parties' objections to form. The Gonzalez Parties' objections to the form of the evidence do not provide an alternative basis for affirming the trial court's order denying the Jurisdictional Plea as to the Gonzalez Parties' takings claims.

        *3.*     *Did the evidence submitted by the Authority prove that it did not cause the Gonzalez Parties' homes to flood?*

The evidence submitted by the Authority proves as a matter of law that each of the Gonzalez Parties' homes would have flooded during Harvey even if the Authority had released no water at all from Lake Conroe and that the Gonzalez Parties cannot prove causation on their takings claims. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 642–43 (Tex. 2012) (concluding that because governmental entity submitted undisputed evidence in support of its plea to the jurisdiction negating an essential element of the plaintiff's prima facie case, the plaintiff had the burden to raise a fact question); *Guadalupe County v. Woodlake Partners, Inc.*, No. 04-16-00253-CV, 2017 WL 1337650, at *3–4 (Tex. App.—San Antonio Apr. 12, 2017, pet. denied) (concluding summary judgment evidence negated causation element of the takings claim as a matter of law) (mem. op.). Thus, to avoid a dismissal of their takings claims based on governmental immunity, the Gonzalez Parties had the burden to submit evidence disputing the Authority's evidence as to causation and raising a fact issue as to whether they can prove causation on their takings claims. *See Garcia*, 372 S.W.3d at 642–43; *Miranda*, 133 S.W.3d at 227–28.

The Gonzalez Parties did not submit evidence disputing the Authority's evidence as to causation or raising a fact issue as to whether their homes would have flooded during Harvey even if the Authority had released no water at all from

18

Lake Conroe. *See Garcia*, 372 S.W.3d at 642–43; *Miranda*, 133 S.W.3d at 227–28. The evidence relevant to this jurisdictional issue is undisputed and fails to raise a fact question on this jurisdictional issue, so that this issue may be ruled on as a matter of law. *See Garcia*, 372 S.W.3d at 642–43; *Guadalupe County*, 2017 WL 1337650, at \*3–4. Under the applicable standard of review, we conclude that the Gonzalez Parties cannot prove that the Authority's release of water from Lake Conroe was a proximate cause of any taking or damaging of the Gonzalez Parties' property because the undisputed evidence proves as a matter of law that each of these properties would have flooded in the No Release Scenario. *See Garcia*, 372 S.W.3d at 642–43; *Guadalupe County*, 2017 WL 1337650, at \*3–4.

Thus, we sustain the Authority's first issue, and we need not and do not address the second or third issue.

**B.    Did the Gonzalez Parties establish any basis for waiver of the Authority's governmental immunity as to their nuisance and gross-negligence claims?**

In its fourth issue, the Authority asserts that it has governmental immunity from suit as to the Gonzalez Parties' nuisance claims and their alleged claims for grossly negligent maintenance and operation of the Lake Conroe Dam (the "Other Claims"). The Authority contends that the Gonzalez Parties failed to assert any basis for a waiver of the Authority's governmental immunity as to these claims. The Authority raised these points in the Jurisdictional Plea. Even though the trial court did not rule on the part of the Jurisdictional Plea challenging these two claims, this court still may address this jurisdictional issue. *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850–51 (Tex. 2000); *Texas Dep't of Transp. v. Esters*, 343 S.W.3d 226, 232–33 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Garcia v. Kubosh*, 377 S.W.3d 89, 93–94 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

19

When, as in the fourth issue in today's case, a party has filed a plea to the jurisdiction challenging the pleadings, we must construe the pleadings liberally in favor of the pleader and look to the pleader's intent. *See Miranda*, 133 S.W.3d at 226. A party suing a governmental entity bears the burden of affirmatively demonstrating the trial court's jurisdiction by alleging a valid waiver of immunity. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). To determine if the party has met that burden, we consider the facts alleged by the party and, to the extent it is relevant to the jurisdictional issue, any evidence submitted by the parties. *Id*.

The Authority is a political subdivision of the State of Texas that generally is entitled to governmental immunity. *See Medina*, 627 S.W.3d at 622. Governmental immunity has two components: immunity from liability and immunity from suit. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). When a political subdivision of the state enjoys immunity from suit under the doctrine of governmental immunity, a court lacks subject-matter jurisdiction. *See Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999).

This case does not involve an ultra vires claim, a claim in which a plaintiff may sue state officers in their official capacity without a statutory waiver of immunity. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 371–73 (Tex. 2009). Even if the Gonzalez Parties tried to assert an ultra vires claim against the Authority, it would be barred by governmental immunity. *See id*. at 372–73. The Gonzalez Parties do not assert that the non-statutory waiver of immunity from the *Reata* case applies, and even if they did, the record does not support a waiver of governmental immunity under the *Reata* case. *See Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371, 373 (Tex. 2006). In this context, for there to be a waiver of the Authority's governmental immunity as to the Other Claims, the

Texas Legislature must have waived the Authority's governmental immunity by clear and unambiguous language in a statute or legislative resolution or the United States Congress must have enacted a statute pursuant to section 5 of the Fourteenth Amendment unequivocally expressing Congress's intent to waive the Authority's governmental immunity as to the Gonzalez Parties' claims. *See* U.S. Const. Amend. XIV, §5; Tex. Civ. Prac. & Rem. Code Ann. § 107.001, *et seq.* (West, Westlaw through 2021 C.S.); Tex. Gov't Code Ann. § 311.034 (West, Westlaw through 2021 C.S.); *Jennings*, 142 S.W.3d at 315–16; *Brice v. Texas Dep't of Fam. & Protective Servs.*, No. 14-20-00506-CV, 2022 WL 1310876, at *2 (Tex. App.— Houston [14th Dist.] May 3, 2022, no pet.) (mem. op.).

Liberally construing the Gonzalez Parties' live petition, they assert both nuisance claims that rise to the level of a taking and nuisance claims that do not rise to the level of a taking. The only waiver of the Authority's governmental immunity alleged by the Gonzalez Parties is the takings provision of the Texas Constitution, which waives governmental immunity for a viable takings claim. *See* Tex. Const. art. I, § 17(a); *El Dorado Land Co., L.P.*, 395 S.W.3d at 801. As to the Other Claims, the Texas Legislature has not waived the Authority's governmental immunity in section 101.021(1) of the Civil Practice and Remedies Code because "motor-driven equipment" does not include "equipment used in connection with the operation of floodgates or water release equipment by river authorities created under the laws of this state." Tex. Civ. Prac. & Rem. Code Ann. § 101.001(4)(A) (West, Westlaw through 2021 C.S.); *see* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1) (West, Westlaw through 2021 C.S.). The Texas Legislature has not waived the Authority's governmental immunity in section 101.021(2) of the Civil Practice and Remedies Code because the Other Claims are not claims for personal injury or death. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2).

In their live petition, the Gonzalez Parties assert that governmental immunity does not shield the Authority from liability for "intentional, non-negligent nuisance and gross negligence relating to the improper maintenance of [the Authority's] property." The only authority that the Gonzalez Parties cite for this proposition is the Supreme Court of Texas's opinion in *Miranda. See Miranda*, 133 S.W.3d at 225. But the *Miranda* opinion does not support this proposition. *See id*. at 224–25. The *Miranda* case involved a potential waiver of sovereign immunity under section 101.021(2) of the Civil Practice and Remedies Code, as modified by the recreational use statute, as to a claim for personal injury. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(2), 101.058; *Miranda*, 133 S.W.3d at 224–25. In this scenario, the governmental entity's sovereign immunity was waived only if it was grossly negligent. *See Miranda*, 133 S.W.3d at 224–25. But, the *Miranda* case does not state that the Texas Legislative has waived the immunity of governmental entities as to "intentional, non-negligent nuisance and gross negligence relating to the improper maintenance of [the entity's] property." *See id*. The Other Claims are not claims for personal injury or death, and thus, the waiver of immunity in section 101.021(2) does not apply. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2). The Texas Legislature has not waived the Authority's governmental immunity as to the Other Claims in the Texas Tort Claims Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.001(4)(A); Tex. Civ. Prac. & Rem. Code Ann. § 101.021.

The Gonzalez Parties have not alleged a waiver of the Authority's governmental immunity by the United States Congress or by the Texas Legislature. *See Dallas Area Rapid Transit*, 104 S.W.3d at 542. Under the applicable legal standard, we conclude that governmental immunity bars the Gonzalez Parties claims against the Authority for grossly negligent maintenance and operation of the Lake Conroe Dam and for nuisance that does not allegedly rise to the level of a

taking. *See id.*; *Jennings*, 142 S.W.3d at 315–16. The trial court lacks jurisdiction over these claims. *See Jones*, 8 S.W.3d at 638. Because, as discussed above, the Gonzalez Parties cannot prove their takings claims and do not have viable takings claims, there is no waiver of governmental immunity for their takings claims or for their nuisance claims that allegedly rise to the level of a taking, and the trial court lacks jurisdiction over these claims. *See Jennings*, 142 S.W.3d at 315–16. We sustain the fourth issue

### III. CONCLUSION

Under the applicable standard of review, we conclude that the Gonzalez Parties cannot prove that the Authority's release of water from Lake Conroe was a proximate cause of any taking or damaging of the Gonzalez Parties' property because the undisputed evidence proves as a matter of law that each of these properties would have flooded in the No Release Scenario. Under the applicable legal standard, we conclude that governmental immunity bars the Other Claims. Therefore, the trial court erred in denying the Jurisdictional Plea. The trial court lacks subject-matter jurisdiction over the Gonzalez Parties' takings claims and the Other Claims. We reverse the trial court's order and render judgment dismissing with prejudice (1) all takings claims asserted by the Gonzalez Parties, (2) the Gonzalez Parties' purported claims against the Authority for grossly negligent maintenance and operation of the Lake Conroe Dam; and (3) all nuisance claims asserted by the Gonzalez Parties.


/s/ Randy Wilson
Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.

23