

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00195-CV

_____

TARRANT REGIONAL WATER DISTRICT, Appellant

V.

SHANNA C. GRANGER AND PROST PRODUCTION, LLC, Appellees

---

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-334056-22

---

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

**MEMORANDUM OPINION**

Shanna C. Granger and Prost Production, LLC, Appellees (collectively, Granger), sued Tarrant Regional Water District (the District), Appellant, claiming that the District breached a permit that it had granted to Granger. Through a series of pre-trial rulings on other causes of action asserted by Granger, the trial court disposed of those causes of action in the District's favor, and they are not part of this appeal. Granger's remaining causes of action were for violations of the takings and due course of law clauses under the Texas Constitution. The District filed a plea to the jurisdiction based on governmental immunity. The trial court denied the plea to the jurisdiction. We will reverse the trial court's judgment on Granger's takings claim and render judgment dismissing that for want of jurisdiction.[1]

## I. Factual Background

The District is a local governmental water control and improvement district established under Article XVI, Section 59 of the Texas Constitution. *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 661 (Tex. 2019). The District supplies raw water to over two million people living in numerous municipalities, operates an extensive levee system in Tarrant County to reduce flood damage, and provides recreational

---

[1]The parties acknowledge that the due course of law claim was mooted by events that transpired before the appeal. We therefore reverse the trial court's denial of the plea to the jurisdiction on that claim and dismiss this claim for want of jurisdiction. *See Meeker v. Tarrant Cnty. Coll. Dist.*, 317 S.W.3d 754, 763 (Tex. App.—Fort Worth 2010, pet. denied).

opportunities to residents. As part of its operations, the District owns and maintains several facilities located in and around its lakes and the tributaries of the Trinity River. One such facility is known as The Shack at Panther Island Pavilion.

For many years, the District, or its subsidiary Trinity River Vision Authority, held an annual Oktoberfest event using The Shack and its surrounding land along the Trinity River Floodway. By 2021, it was the District's most profitable event and was the largest Oktoberfest event in Fort Worth. It had been developed over the prior seven years with budgeted public funds used to purchase furniture and accoutrements, advertise the event, staff the event, and build brand recognition for the event.

When the District decided against holding the event again, former District employee Shanna Granger, who was involved in managing Oktoberfest while employed at the District, sought to independently take over the Oktoberfest event from the District and hold it at The Shack in September 2022. On March 9, 2022, the District issued a permit to Granger to use The Shack and surrounding parking areas to hold the Oktoberfest event from September 21 through 24, 2022 in return for Granger's payment of $6,000. In pertinent part, the Permit provided,

> [T]he District does hereby grant unto Event Producer [Granger], at [Granger]'s sole cost, risk, and expense, **non-exclusive** right of use of The Shack at Panther Island Pavilion for a festival named Oktoberfest Fort Worth on September 21–24, 2022, herein-after referred [to] as the "Event". [Granger] additionally [shall] have the **non-exclusive** right to set up and take down the Event during the period beginning on September 7, 2022 [and] ending on October 1, 2022. The [E]vent shall be conducted along the Trinity River Floodway and The Shack at Panther Island Pavilion only in the areas designated on Exhibit "A" &

"B" attached hereto and incorporated herein for all purposes (the "Premises"). [Emphases added.]

**Exhibit A**



**Exhibit B**



The Permit also provided that the District would manage parking for the event, that parking would cost $10 per vehicle, and that Granger had the option to pre-purchase up to 50 VIP parking spaces at $5 per vehicle. Notably, the area on Permit

Exhibit A designated for parking takes up the vast majority of the "non-exclusive" permit area.

The "Permit" expressly prohibited Granger from operating "for any other purpose or purposes without the express written consent of the District." It reserved to the District the "right to enter the Premises at all times for any purpose reasonably necessary to ensure [Granger]'s compliance with the District's General Ordinance, the covenants and provisions of the Permit, the rules and regulations governing Panther Island Pavilion, or for any purposes connected with the District's operation as a Water Control and Improvement District." The Permit required Granger to maintain general and auto liability insurance and workers compensation insurance covering liabilities arising from Granger's use of the property and to indemnify the District for any such liabilities. Further, the Permit gave the District the right to terminate the permit upon ten days prior written notice for "any reason deemed necessary by reason of its function as a Water Control and Improvement District but not for mere convenience or to grant a permit to another party." Finally, the Permit provided that nothing in the permit "shall be deemed or construed to waive the District's sovereign or governmental immunity."

For reasons that are in dispute but that are not pertinent to this opinion, the District gave ten days' notice to Granger on June 6, 2022, that it would terminate the Permit effective June 16, 2022. The District returned the $6,000 permit fee. Prior to the cancellation, Granger had expended significant funds in preparation for hosting

5

the event. Those sums were not reimbursed by the District. Granger then found another location where they hosted the event. This lawsuit followed.

## II. Standards of Review

Governmental immunity does not shield the government from an action under the takings clause. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). Granger asserts a claim for damages for inverse condemnation under Article I, Section 17 of the Texas Constitution, categorizing the Permit as a lease, which would make the Permit a vested property interest for purposes of the takings clause. The District contends that because the Permit only constituted a license to use the premises, which is not a vested property interest subject to the takings clause, the trial court lacked subject-matter jurisdiction over Granger's takings claim. Whether subject-matter jurisdiction exists is a question of law that can be challenged by a plea to the jurisdiction. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Accordingly, whether Appellee's claims confer subject-matter jurisdiction on the court is a question of law that we review de novo on appeal. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

## III. Analysis

The first question that we must decide is whether the Permit is a license or a lease. If it is a license, it conveys no interest in the property and is hence no basis for Granger's constitutional takings claim. *See H.E.Y. Tr. v. Popcorn Express Co., Inc.*, 35 S.W.3d 55, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (explaining

6

that real property license does not create any title, interest, or estate in real property); *see also Cypress Forest Pub. Util. Dist. v. Kleinwood Mun. Util. Dist.*, 309 S.W.3d 667, 675 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("A person asserting a valid article I takings claim must show that it has a vested property interest."); *Mr. W Fireworks, Inc. v. Alamo Fireworks, Inc.*, No. 04-04-00934-CV, 2005 WL 2216501, at *2 (Tex. App.—San Antonio Sept. 14, 2005, no pet.) (mem. op.) (stating that license conveys no interest in real property). However, a lease does create a vested property interest subject to the takings clause. *Colley v. Carelton*, 571 S.W.2d 572, 574 (Tex. App.—Corpus Christi 1978, no writ).

In construing an agreement, the primary focus is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, 531 S.W.3d 234, 241 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Fairfield Indus.*, 531 S.W.3d at 241. But when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and we construe it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We must enforce an unambiguous contract as written. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). Our role is not to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it. *See*

7

*Am. Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162; *Helmerich & Payne Int'l Drilling Co. v. Swift Energy Co.*, 180 S.W.3d 635, 646 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We give each term in an agreement its plain, ordinary, and generally accepted meaning unless the agreement itself shows the term to be used in a technical or different sense. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex. 1996). We examine the entire agreement to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).

So, what is a "real property license?" In holding that a popcorn Purveyor Contract in Houston's Intercontinental Airport was a license, not a lease, our sister court defined it as a "**privilege** to go on premises for a certain purpose, but does not operate to confer on, or vest in, licensee any title, interest[,] or estate in such property." *H.E.Y. Tr.*, 35 S.W.3d at 58 (emphasis added) (quoting Black's Law Dictionary 920 (6th ed.1990)). That contract authorized Popcorn Express to operate a food and beverage concession in the airport. The court noted that

> [b]y signing the "Purveyor Contract," Popcorn Express covenanted to "use the 'Contracted Premises' only for the sale of popcorn and beverages." This contract, limiting Popcorn Express's "right to do certain things upon the property of another," does not constitute a lease which would grant the lessee the right to possess the land "for all purposes" not prohibited by the contract.

*Id.*

A particularly instructive case is *Kibbin v. McFaddin*, 259 S.W. 232 (Tex. App.—Beaumont 1924, writ ref'd). McFaddin was the owner of a tract of land. He executed a written "lease" to Kibbin that provided,

> This lease is given to the said lessee for the purpose of trapping of muskrats on said land and other wild fur-bearing animals, and fishing, and for no other purposes. And it is expressly understood that the giving hereof shall in no manner interfere with or affect the right of the owners and lessors, and those claiming the privilege under them, to use said land for grazing cattle thereon and hunting ducks and other wild game thereon, and any and all other purposes not inconsistent with the trapping and fishing privileges given to lessee. The said lessee shall not sublet or assign any right hereunder to others or permit others to exercise or use any privilege herein granted to lessee, without the express written consent of the lessors.

*Id.* at 232.

The court held that the agreement, even though styled as a lease, was actually "only a personal **license** to Kibbin to enjoy the **rights** granted him by its terms, and is in no sense a technical lease, as that term is understood." *Id.* at 234 (emphasis added). From the terms of the contract as a whole, the intent of the contract was for Kibbin to be the only person with hunting, fishing, and trapping privileges, and the owners and lessors could use the property for anything not inconsistent with those privileges. *See id.*

So, what is a lease? "A lease grants a tenant exclusive possession of the premises as against the owner. *See Brown v. Johnson*, 118 Tex. 143, 12 S.W.2d 543 (1929) (essential quality in lease is it should appear to have been intention of one party to dispossess himself of premises and of other to occupy them)." *H.E.Y. Tr.*, 35 S.W.3d

9

at 58; *see also Mr. W Fireworks*, 2005 WL 2216501, at \*2 ("It is well-settled that a lease is valid only if it confers upon the lessee the right to exclusive possession or occupancy of the premises described in the granting clause.").

The agreement here is unambiguous on its face. It is entitled "Permit." Article 1 provides that the District grants to Granger, at Granger's sole cost, risk and expense, a

> **non-exclusive right of use** of The Shack at Panther Island Pavilion for a festival named Oktoberfest Fort Worth on September 21-24, 2022, hereinafter referred to as the 'Event'. [Granger] additionally [shall] have the **non-exclusive right** to set up and take down the Event during the period beginning on September 7, 2022 [and] ending on October 1, 2022. The event shall be conducted along the Trinity River Floodway and The Shack at Panther Island Pavilion only in the areas designated on Exhibit "A" & "B" attached hereto and incorporated herein for all purposes (the "Premises"). [Emphases added.]

Article 4.A. of the Permit gives Granger the privilege of conducting the event along the designated areas of the river floodway and prohibits Granger from operating under the Permit for any other purposes without the express written consent of the District. Article 4.B. prohibits Granger from using the privileges granted under the Permit so as to constitute a nuisance or for any illegal or immoral purposes and requires Granger to comply with all laws of a variety of listed governmental agencies. Article 4.C. requires Granger to keep the premises clean and orderly in multiple specific terms.

Article 4.D. gives the District the right to enter the premises at all times for any purpose reasonably necessary to ensure Granger's compliance with the District's

10

General ordinance, the terms of the Permit, the rules and regulations governing the Pavilion, or for any purpose connected with the District's operation as a water district.[2] As noted above, the Permit places the control of the parking with the District, even to the extent that Granger, although they had paid for the Permit to use the parking area for the event, must pay extra for reserved spaces.

In this case, the intent of the parties is clear. The document is described as a permit, not a lease. It clearly and unmistakably provides that Granger is receiving a non-exclusive right to use the District's property for a limited time for a limited purpose. The Permit gives Granger the right to use the property described in the permit but also gives the District the right to control the biggest portion of the space, the parking lot. The Permit also gives the District the right to come onto the permit area for any reason necessary to perform its duties as a water district. Considering the document as a whole, no reasonable construction can be given to it that would make this Permit a lease as opposed to a license.

Granger relies on the recent Texas Supreme Court opinion of *JBriceHoldings, L.L.C. v. Wilcrest Walk Townhomes Ass'n*, 644 S.W.3d 179, 186 (Tex 2022), to support their position that the agreement is a lease. *JBrice* involved the enforceability of restrictions on short-term rentals in a townhome community governed by a homeowners association. One issue addressed by the court was whether a short-term

---

[2]It is noteworthy that the District had operated this very event for the preceding several years as part of its operations as a water district.

rental of a townhome constituted a lease or some lesser form of interest. *Id.* The court defined a lease as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration[.]" *Id.* (quoting Lease, Black's Law Dictionary (11th ed. 2019)). The court then went on to note that it had held in *Tarr* that a short-term rental is a lease "so long as it maintains the characteristics of a lease; namely the right to use and occupy the property." *Id.* (citing *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 290–91 (Tex. 2018)). In that regard, the court specifically noted that the JBrice contracts allowed the short-term tenants "the right to **exclusively** occupy the townhomes for the duration specified in the rental agreements; the evidence does not indicate otherwise." *Id.* (emphasis added). In other words, the length of the rental does not determine whether it is a lease or a license; it is the rights conferred that determine the issue.

Granger argues that under the literal Black's Law Dictionary definition recited by the supreme court in *JBrice*, the Permit was a lease because Granger had paid consideration for the right to use and occupy the property. However, we must consider the entire discussion by the court to properly apply its meaning. The court did not just apply the simplistic dictionary definition. It also said that the contract must possess the characteristics of a lease and pointed out that the short-term rental agreements in question provided for the right to exclusive occupancy. *Id.* This would make its holding consistent with established Texas law regarding the need for a contract to provide for exclusive occupancy or possession in order to be considered a

lease. We do not believe the court would change such well-established law without expressly saying so. We reject Granger's interpretation of *JBrice*.

Finally, Granger argues that the provisions in the Permit that required Granger to purchase insurance and add the District as an additional insured and that prohibited Granger from subletting, assigning, or encumbering or transferring the permit without the District's prior written consent make the Permit a lease. Granger cites no authority in support of this argument, and we are not persuaded. In *Kibbin*, the lease that was held to be a license prohibited the licensee from subletting or assigning any rights under the document or permitting others to use any privilege granted to the licensee without the express written consent of the licensor. 259 S.W. at 232; *see also Digby v. Hatley*, 574 S.W.2d 186, 188–90 (Tex. App.—San Antonio 1978, no pet.) (holding that document purporting to be a lease for hunting and grazing rights, which had a "no assignment" clause, was actually a license to hunt on the property).

We also do not believe that the District's requirement of insurance coverage or reserving of rights to go onto the property to inspect for compliance with laws or contractual obligations, or to perform its duties as a water district, should cause the Permit to be construed as a lease rather than a license. Whether an owner of property allows the use of its property by another through a lease or a license, the owner still may legitimately seek to protect its ownership and financial interests by contractually obligating the user to not transfer any use or property rights to others and to protect

13

against third-party liability risks by providing insurance coverage and indemnification. The presence or absence of those matters is not determinative of whether the relationship between the owner and the user is that of lessor-lessee or licensor-licensee. *Digby*, 574 S.W.2d at 188–90; *Kibbin*, 259 S.W. at 232.

## IV.    Conclusion

We sustain the District's sole issue on appeal.[3] Having sustained its sole issue, we reverse the judgment of the trial court and render judgment dismissing Granger's claims for want of jurisdiction.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  March 14, 2024

---

[3]The District's sole issue is whether the trial court erred in denying its plea to the jurisdiction. However, it has three sub-arguments. The first sub-argument, which we have sustained, challenges whether the Permit conferred a vested property right that would support a valid takings claim or due course of law claim. Since the remaining sub-arguments were asserted in the alternative, we need not address them. *See* Tex. R. App. P. 47.1.

14